Miller *v*. Welles.

## Miller *vs.* Welles.

The plaintiff brought her bill in equity, alleging, that she delivered to the defendant $3,000, upon the special trust and confidence, that he should account to her therefor, on demand; that she delivered said money to him, upon the understanding, that he was to invest the same and account therefor, as her agent and trustee; and further alleging, in detail, a breach of such trust and confidence, and fraud of the defendant, in obtaining said money. The cause was referred to a committee, who, in support of the allegations of fraud, found, that the parties were neighbors, that the plaintiff was a woman, and the defendant a man of intelligence, and such other facts only as would tend to sustain an action at law against the defendant, for false and fraudulent representations; but did not find, that any peculiar relation, from which fraud could be inferred, existed between them, and further found, that no fraud or fraudulent intent existed, unless the same was inferrible from the facts found by them, and that there was no trust, other than such as the law would imply from said facts. Held, 1. That it is an established principle of the common law, that where both fraud and damage concur, the law will give relief. 2. That disputable presumptions of law may be rebutted by proof, and that, when evidence has once been admitted, for that purpose, they are resolved into questions of fact. 3. That courts of equity will, for reasons of public policy, often infer fraud, from the existence of certain relations; as, from that between parent and child, guardian and ward, attorney and client, when the confiding party has suffered in a bargain, without looking for the proof of positive fraud; yet it will not do so, from that existing between neighbors, acquaintances and friends. 4. That the facts, found by the committee, laid no foundation for the interference of a court of equity.

Nancy Miller brought her bill in chancery, to the superior court, against Thaddeus Welles, alleging that, on or about the ———— day of ————, she delivered to the defendant three thousand dollars, her own proper moneys, upon the special trust and confidence that the defendant should account to her therefor, on demand; that the defendant received said moneys upon such trust and confidence, and so to account therefor. Also alleging, that, if the court should be of the opinion, that if the defendant did not so receive the said moneys, and the same were not delivered to him by the plaintiff, to be accounted for in manner aforesaid, yet the same were, on or about the ———— day of October, 1847,

delivered to him by the plaintiff, upon the special trust and confidence that he, as trustee and agent of the plaintiff, should safely, securely, and in good faith, invest the same at interest, in good, sufficient, and proper securities, for the benefit and on account of the plaintiff, and that the defendant received said moneys, upon such special trust and confidence, and upon the understanding, that he was so to invest said moneys, as the trustee and agent of the plaintiff, and in good faith, and to account therefor, as such trustee and agent.

Said bill then proceeded to charge, in detail, a breach of such trust and confidence, and fraud of the defendant, in obtaining the money, and prayed for a disclosure by the defendant. The defendant having filed his answer to the bill, the court appointed a committee, to find the facts in the case, who made their report, substantially as follows.

The plaintiff and defendant were both residents of the town of Glastenbury, and county of Hartford. On the 13th day of October, 1847, the plaintiff, being then the owner of a farm in said town, and having negotiated the sale of the same to one Richards, went, in company with him, to the house of the defendant, who was then town-clerk of Glastenbury, for the purpose of completing the sale of said farm.

The deed, being drawn by the defendant, was then executed, and delivered, by the plaintiff, to Richards, who paid over the purchase money, in cash, amounting to three thousand dollars. The defendant counted the money at Richards's request, when some conversation ensued between the parties, as to what the plaintiff would do with the money, in the course of which, she asked the defendant if he did not want it; to which he answered that he did not. She said that she wished he would take it, and upon his further refusal, enquired of him, if he knew any one that did want it, or would take it. He at first replied that he did not think of any one, but soon suggested the Eagle manufacturing company, a corporation located in Glastenbury, saying that that company sometimes borrowed money.

Miller *v.* Welles.

The defendant made no representations or statements respecting the credit or solvency of said company, other than to mention it as a borrower, in reply to the enquiry of the plaintiff; but the plaintiff, upon such suggestion, and in consequence of the same, determined to lend the money to said company; and thereupon said to the defendant, that she wished he would keep the money, and see the company, and if they wanted it, to let them have it, and to take their note. The defendant answered, that he should see the agent in a few days, and would do the errand, and that, if they wanted the money, they would come or send after it. The defendant then desired her to take the money, but she urged him to keep it for her, which he at first declined to do, saying that he did not want so much money in his house, and would not be responsible for it; but he at length consented to take the money, and in fact kept the same in his possession, until loaned to said company.

On the 19th of said October, the defendant, acting in pursuance of the direction of the plaintiff, loaned said money to said company, and Samuel H. Huntington, the agent of said company, received the same, and thereupon executed two notes for the same, in the name of the company, to the plaintiff, one payable in one year from date, and the other on demand, which notes the defendant took into his possession, and in a few days thereafter, called with them upon the plaintiff, and exhibited them to her, for the purpose of enabling her to choose which of them she would take. She chose the note payable on demand, and took the same. The note so taken is the same recited in the bill, and is in the words and figures following, *viz.*:

" $3,000.            GLASTENBURY, Oct. 19th, 1847.

" For value received, the Eagle manufacturing company promise to pay to the order of Nancy Miller, three thousand dollars on demand with interest.

" SAM'L H. HUNTINGTON, *agent.*"

The plaintiff still continued to hold said note, which was wholly unpaid, either by the said company or by the defendant, and it was not possible to collect the same, from said company.

It does not appear, that there was any agreement or understanding, for the payment of any compensation to the defendant, for his services, in effecting said loan to said company.

On the 13th of October, 1847, and for a considerable period before that time, said company was and had been deeply insolvent, and on the 9th day of March, 1848, became openly insolvent and failed, and has ever since so remained.

Shortly preceding its failure, said company executed sundry conveyances and mortgages to secure certain creditors, guarantors, and endorsers, including a mortgage to the plaintiff to secure her said note, which mortgage was executed without her knowledge, by the procurement of the defendant, and was the only security taken by him, or which the plaintiff ever had for her loan. Said mortgage was of no value whatever, in consequence of the priority of said other mortgages, and said conveyances and mortgages embraced all the effects and means of payment of said company, which has ever since ceased to have any property or effects, or to transact any business.

Neither at the time when said money was left with the defendant, nor when the plaintiff took said note, nor at any time prior to said failure, did it appear that the plaintiff had any knowledge of the circumstances or situation of said company, or had any reason to doubt its credit or solvency.

On said 19th day of October, 1847, the defendant was a stockholder, a director, and the president, of said company, and so continued, until the time of its failure, and ever since; he had been a stockholder, at least as early as the year 1834, a director since the same year, and president since the year 1835. But it did not appear that the defendant, as president, ever received any compensation, or was ever charged with,

or considered responsible for, any special duties, either connected with the financial affairs, or with the manufacturing or other business of said company, or that he had, as such, any special means of information as to its affairs, more than any other director. During all said period, there was a general agent of said company, having the general charge of its affairs, and acting independently of the president.

On said 13th day of October, and for more than one year prior thereto, there were and ever since had been but four stockholders of said company, each of whom had an equal interest and owned one-fourth part of the capital stock, *viz.* : the defendant, who was the president ; his brother, Gideon Welles, of Hartford ; Samuel H. Huntington, of Hartford, who was the secretary, treasurer and general agent, and David S. Treat, of Glastenbury, who sometimes acted as book-keeper, and who also had charge, as foreman or superintendent, of the manufacturing operations of the company. The defendant, and said Huntington and Treat, were the directors of the company. When said money was left with the defendant, he was imperfectly acquainted with the condition and affairs of the company, although he had been in the habit of frequently visiting their factory and store, and had attended the meetings of the company, and of the directors. He did not then know or suppose said company to be insolvent, although he did know it to be then, and for a long time before, largely indebted, and that for several years preceding, there had been difficulty in carrying on its business, for want of sufficient capital, and it had paid no dividends since the year 1837 ; but at said times the defendant believed and expected that said company would ultimately extricate itself from said embarrassments, and become prosperous.

At the time said money was left with the defendant, the following facts connected with the situation of said company, were known to the defendant, but were not at any time communicated, by him, to the plaintiff.

1. In January, 1845, Frary Hale, who had been a stockholder, director, and general agent, of the company, in pursuance of an agreement with the company, transferred to them all his stock, being eighty-nine shares, the *par* value of which was 8,900 dollars, in consideration of certain real estate then conveyed to him by the company, valued at about 2,000 dollars, and for which, in addition to said stock, he paid the company between three and four hundred dollars.

2. On the 31st day of August, 1846, the defendant and said Gideon Welles, Samuel H. Huntington and David S. Treat, being then the sole owners of the stock of said company, and owning the same in the following proportions, *viz.*, the defendant 53 shares; Gideon Welles, 48 shares; Samuel H. Huntington, 162 shares; and David S. Treat, 52 shares; made and entered into the following agreement:

"Whereas we, the subscribers, are the owners of all the stock of the Eagle Manufacturing Company, each of us owning shares as follows, *viz.:*

"Gideon Welles, forty-eight shares.

"Thaddeus Welles, fifty-three shares.

"David S. Treat, fifty-two shares.

"Samuel H. Huntington, one hundred and sixty-two shares.

"And whereas said company is embarrassed in its pecuniary condition, owing about seventeen thousand dollars, accommodation paper, at the Hartford Bank, and having a large amount of other outstanding debts; now therefore, with a view of relieving said company from its embarrassments, especially by reducing the amount of its accommodation paper, we the said stockholders do hereby covenant and agree, each with the others, and each considering the promise and agreement of the others a consideration for his own, that they will,

"I. Reduce the number of the shares of stock to two hundred.

"II. That each stockholder shall become the owner of fifty shares—the said Treat agrees to transfer *two* shares to the

said Gideon Welles, and the said Thaddeus Welles, and the said Huntington, agree to transfer to said company, the surplus over and above fifty shares each, owned by them, which surplus shall be considered as cancelled, unless the company shall hereafter be disposed to sell a portion of the same, not exceeding one hundred shares, at such price as said company may fix upon the same.

" III. That said stockholders, the subscribers hereunto, will, and do hereby assess themselves to the amount of *fifty per cent.* on the par value of said fifty shares of stock, owned by each, being *two thousand five hundred dollars*, to each stockholder, and they do hereby individually promise and engage, in consideration of the promises, to pay said sum, so assessed to each of them, into the treasury of said company, for the purpose herein before specified, in cash, with interest from the date hereof, on or before the first day of January, A. D. 1847.

" Dated at Hartford, this 31st day of August, A. D. 1846."

It did not appear whether the transfers of stock therein stipulated to be made were ever, in point of fact, made, but after the execution of said instrument the several parties mutually regarded each other as equal owners of the capital stock of the company.

3. During the year preceding said loan, on several occasions the workmen and other creditors of said company were not paid promptly, and complaints of such want of promptness came to the knowledge of the defendant.

4. On the 13th and 19th days of October, 1847, said company was indebted to the defendant, and said Huntington, by their note for ten thousand dollars, and to the defendant alone, by their three notes for $1,781.55, $301.92, and $157.85, and also by book in the sum of $2,937, and they held the note of the defendant for $2,500, being his part of the sum of ten thousand dollars, mentioned in the agreement aforesaid.

5. To carry on the business of the company, large bank

accommodations and other loans were necessary, and the defendant and said Huntington had been for some years, in the habit of endorsing the company paper, and on said 13th and 19th of October, a large amount of paper was outstanding at the Hartford Bank and elsewhere, for which the defendant was responsible, as endorser or guarantor.

6. At a meeting of said company, on the 7th of June, 1847, it was voted to raise ten thousand dollars by loan, for the use of the company, and also voted, that to effect said loan, the president be authorized and directed to execute, to the defendant and Samuel H. Huntington, the company's note for the sum of ten thousand dollars, payable on demand, and also to execute a proper mortgage of any, or all the real estate and fixed machinery belonging to the company, to said Welles and Huntington, as collateral security for said note. In pursuance of said vote, the defendant and said Huntington soon after procured, and lent to said company, said sum of ten thousand dollars, and took the company note for that amount; but no mortgage was executed by said company, in pursuance of said vote, to secure said note, until the 27th day of November, 1847, when a mortgage of that date was executed for that purpose.

The three thousand dollars, so borrowed of the plaintiff by said company, except fifty dollars, which was received by said Treat, and applied to the payment of workmen, was deposited by said Huntington, as agent of the company, in the Hartford Bank, with other funds of the company, and afterward drawn out and applied by said agent, for the benefit of the company, without any specific knowledge or direction of the defendant.

The committee found, that no confidence or trust was reposed by the plaintiff in the defendant, as her trustee or agent, other than such as the law would imply, from the facts found by them. Also, that there was no actual fraud or fraudulent intent on the part of the defendant in procuring said money from the plaintiff, or in effecting the loan of the

same to the company, and no fraud whatever, unless the same may be implied by law from the facts found.

The question, as to what decree should be passed in the case, was reserved, by the superior court, for the advice of this court.

*Welles* and *Fellowes*, for the plaintiff, after remarking that the case proceeded on the ground of fraud, contended,

1. That the facts, found by the committee, show a confidential relation of the parties, who did not stand to each other in the relation of borrower and lender merely, each treating and acting for himself, but that the defendant was a borrower in the guise of a confidential adviser, and that the law, from those facts, implies fraud. That the defendant was not to receive reward makes no difference. His consenting to act was a sufficient consideration to support the implied promise to act faithfully. *Elsee* v. *Gatward*, 5 Term R., 148. 1 Story's Eq., p. 325, §§ 307–323 inclusive. *Fox* v. *Mackreth*, 2 Cox, 323. *Gibson* v. *Jeyes*, 6 Ves., 278. *Taylor* v. *Obee*, 3 Price, 301. *Welles* v. *Middleton*, 1 Cox., 122. *Hunter* v. *Atkyns*, 3 M. & Keen, 113.

2. That the report shows fraud arising from misrepresentation, or the *suggestio falsi*. The plaintiff's inquiries, addressed to the defendant, were obviously inquiries as to the safe and proper investment of her money, with the most entire confidence in the prudence and honesty of his answers. He was not bound to answer. But consenting to answer, he was bound to answer truly, and with all that care and caution which a party, undertaking to advise another in a matter of such moment, is bound to observe. Whether the defendant's answer was with, or without knowledge, it comes within the true idea of a legal *suggestio falsi*. 1 Story's Eq., p. 216, § 191, § 192, § 193, § 196, § 197, p. 411, § 384. *Broderick* v. *Broderick*, 1 P. Wms., 240. *Evans* v. *Bicknell*, 6 Ves., 182, 183. *Pidcock* v. *Bishop*, 3 Barn. & Cress., 605, (10 E. C. L., 197.) *Bacon* v. *Bronson*, 7 Johns. Ch., 194. *Bur-*

*rows* v. *Lock*, 10 Ves., 474. *Pearson* v. *Morgan*, 2 Bro. Ch. R., 389.

3. That the report shows fraud, arising from concealment, or the *suppressio veri.* A variety of facts are found by the committee, showing that the Eagle company was not a safe borrower, which were unknown to the plaintiff, were known to the defendant, and which he suppressed; but knowing which, he was bound to disclose. This obligation arose from his accepting the confidence and consenting to answer the inquiry addressed to him. It also arose from his interest in the transaction, growing out of his relations to the company. He was in fact a party to the transaction, by which the money was obtained, and, on this ground, bound to disclose. The facts concealed were also such as, if disclosed, would have induced the plaintiff to avoid the company, as borrowers of her money. *Walker* v. *Symonds*, 3 Swanst. R., 62; referred to in 1 Story's Eq., p. 241, note. *McCormick* v. *Malin*, 5 Blackford, 509. *Joyce* v. *Taylor*, 6 Gill & Johnson, 54.

4. Fraud arising from a violation of the policy of the law. The policy of the law is, that the credit of corporations shall be based upon capital, set apart for the safety of persons dealing with them. It is also the policy of the law, that the officers of corporations shall protect the public, by carrying on the business upon the faith of that capital. The company had ceased to have any capital, and the officers were carrying it on upon fictitious capital, which was a fraud upon the public, for the aiding to accomplish which, this money was obtained. To protect himself, the defendant sets up, that he delivered the money to the company, by the direction of the plaintiff. That direction having been procured by him, in furtherance of this general fraud, he is estopped from such a defence. 1 Story's Eq., p. 310, § 293, § 294, § 295, § 297, § 298, note; p. 356, § 333, § 349, § 380. *Chesterfield* v. *Jansen*, 2 Ves. Sen., 156, 157.

5. That the defendant is, consequently, a trustee of the

money and accountable to the plaintiff. Whenever a party obtains property tortiously, he is considered, in equity, as a trustee for the injured party, and accountable. 1 Story's Eq., p. 502, § 460, § 463, § 464, § 467. *Callender* v. *Colegrove*, 17 Conn. R., 1. Story on Bailments, p. 112, § 157, § 158, § 159, § 170, § 191. As to the interest, see § 194.

6. That the plaintiff's remedy is in equity. Equity can presume fraud, but at law it must be proved. Law is bound by forms, but equity can search into the substance, and can shape the relief to the infinite varieties of fraud. Hence, equity has a concurrent jurisdiction with law, in cases of fraud. The object of this bill is to set aside the fraudulent claim of the defendant, that he acted in pursuance of the plaintiff's direction. The bill seeks a discovery in matters material to the case. For this reason, also, equity has jurisdiction. Having taken jurisdiction to grant the discovery, it will also grant the relief. *Gallatian* v. *Cunningham*, 8 Cow., 370. *Chesterfield* v. *Jansen*, 2 Ves. Sen., 156. *Fullagar* v. *Clark*, 18 Ves., 482. *Denton* v. *M'Kenzie*, 1 Desau., 300. 1 Story's Eq., § 455, § 456, § 464, § 467. Lewin on Trustees, p. 321, note.

*Hungerford* and *Bulkeley*, contra, contended,

1. That no facts are found by the committee from which the law can imply fraud, or any other ground of relief. The report entirely negatives any actual or intentional fraud, on the part of the defendant, and any relation between the parties out of which a constructive fraud could grow.

2. That the facts found by the committee to have been known to the defendant, and not to the plaintiff, nor communicated to him at the time the money was received and loaned, were all adduced and are to be considered and deemed merely as evidence tending to prove the defendant's knowledge of the insolvency of the company, and a fraudulent intent, or actual fraud on his part, in so receiving and

loaning the money; both of which facts are expressly nega-tived by the finding.

3. That unless the facts so found, constitute a fraud *per se*, they can be of no avail to the plaintiff, inasmuch as, if they are to be considered in the light of evidence merely, the committee and court have negatived the inference they were intended to support.

CHURCH, C. J. If, from the facts found and reported by the committee in this case, we can discover nothing more than such as would sustain an action at law against the respondent, for false and fraudulent representations of the credit and solvency of the Eagle Manufacturing Company, whereby the plaintiff was induced to loan them the money, and take the note described in her bill, we should not find enough to sustain this application in equity, as the remedy at law would be entirely adequate. It is an ancient prin-ciple of the common law, that where both fraud and damage concur, the law will give relief; a principle which has since been very fully recognized, modified and enforced in the cases of *Pasley* v. *Freeman*, 3 Term. R., 51; *Haycraft* v. *Creasy*, 2 East, 92; *Wise* v. *Wilcox*, 1 Day, 22; *Vernon* v. *Keyes*, 12 East, 632; *Upton* v. *Vail*, 6 Johns., 182; *Galagher* v. *Brunel*, 6 Cowen, 346; 1 Sw. Dig., 571; and in many other cases, and elementary books.

Of this, the plaintiff's counsel were fully aware, and there-fore, throughout the entire bill, they have introduced aver-ments, and relied upon the allegation and proof of facts, peculiar and necessary to sustain the jurisdiction of a court of equity. They have very distinctly and prominently alleged a trust,—a confidence of a peculiar character, of which a court of equity should take cognizance,—and also an obligation to account, as trustee and agent, for the moneys received. These, as general allegations, are important, and give character to the bill, and without which, or some of them, it would be difficult to sustain it.

They have proceeded, in detail, to allege the breach of this trust and confidence, and the fraud of the defendant, in obtaining the money from the plaintiff.

We see no necessity of examining all these averments, or the facts found by the committee, in explanation or denial of them ; because, all of them and also the facts set up in the remonstrance of the plaintiff, if true, have been submitted to, and considered by them ; and the result was, that no confidence or trust was established by the proof, and no fraud or fraudulent intent whatever existed, unless the same may be implied from the facts found. The committee, therefore, has left nothing for the court to decide, but the question whether trust, confidence or fraud, will be implied by law, which did not exist in fact.

The law recognizes constructive frauds, as in some measure distinct from frauds in fact. Courts of equity especially, will, for reasons of public policy, oftentimes infer fraud from the existence of certain relationships, where the confiding party has suffered in a bargain, as in cases of parent and child, guardian and ward, attorney and client, physician and patient, &c., and will set aside conveyances, where the bargain appears to have been a hard one, and without looking for the proof of positive fraud or wicked intent. But no relationship or connection, of any peculiar character, existed between these parties. They were neighbors, and that was all, except that the plaintiff was a woman, and the defendant a gentleman of intelligence. We can infer no other confidence. But no case has been found, in which courts have ever inferred fraud, from such ordinary circumstances as these; and especially, where it did not appear that the party charged, acted with a special reference to his own personal advantage. On the contrary, it is said that a court of equity will not interfere, merely because a man of more honor would not have participated in the suspected transaction. The relationship must be such as to demand of the one to make

a full discovery to the other.   1 Sto. Eq., § 309.   So courts will, in some instances, treat certain conduct of parties as amounting to fraud, *per se ;* holding that the law fixes the fraud, and that facts can not remove it.   But we see no fact, or set of facts, found by this committee, which conclusively show this transaction to be fraudulent, or such as the law can not sanction.

There are also, *disputable presumptions of law ;* but these may be rebutted, and when evidence is once admitted to rebut them, they result in mere questions of fact.   If there be any such in this case, they have been disposed of by the committee.   1 Greenl. Ev., § 33.

We can not suppose that the committee intended to refer to the court the decision of any question of fact; anything, which, either by positive proof, or by the application of presumptive or circumstantial evidence, was the subject of proof. They certainly had no right to do this, and we can not assume such a jurisdiction.

Can we say then, more than the committee have said? And if not, we see not how the petitioners are entitled to relief, in a court of equity.   We advise the superior court, to dismiss the bill with costs.

In this opinion the other judges concurred.

Bill dismissed.